(78 South. 247)

No. 22542.

CLOGHER v. NEW ORLEANS RY. &
LIGHT CO.

(Oct. 29, 1917. On Rehearing, April 1, 1918.)

*(Syllabus by the Court.)*

1. CARRIERS ☞303(11)—SETTING DOWN PAS-
SENGERS—CARE REQUIRED.

A common carrier is bound to exercise the
strictest diligence in setting down a passenger
as safely, as the means of the conveyance em-
ployed and the circumstances of the case will
permit, and that duty is the more incumbent
upon it when the conveyance is stopped at an
unusual and more or less dangerous place.

*(Additional Syllabus by Editorial Staff.)*

On Rehearing.

2. CARRIERS ☞303(11)—SETTING DOWN PAS-
SENGERS—CARE REQUIRED.

It is not negligence for a street car com-
pany to stop its car either short of or beyond
the regular stopping place, although the place
where the car is stopped is not precisely sim-
ilar to that at the regular stopping place.

3. CARRIERS ☞303(13)—SETTING DOWN PAS-
SENGERS—NEGLIGENCE.

Where a street car stopped 15 or 20 feet be-
yond its usual stopping place at a place where
the step of the car was 15½ or 16 inches above
the roadway, so that a passenger might safely
alight by extending his foot 7 inches out and
stepping down while holding onto the handle-
bar, such place was reasonably safe, and carrier
was not liable for injury to passenger while
alighting.

Leche, J., dissenting.

Appeal from Civil District Court, Parish of
Orleans; T. C. W. Ellis, Judge.

Action by Mrs. Michael Clogher against
the New Orleans Railway & Light Company.
Judgment for plaintiff, and defendant ap-
peals. Judgment set aside, and suit dis-
missed.

Dart, Kernan & Dart, of New Orleans, for
appellant. Meyer S. Dreifus and Hebert W.
Kaiser, both of New Orleans, for appellee.

LECHE, J. On July 9, 1915, shortly before
the noon hour, plaintiff was a passenger on
one of defendant's electric railway cars, going
out on Tulane avenue. After the car had
crossed Miro street, and being then within
one block of the intersection of Tonti street,
where that street runs across Tulane avenue,
plaintiff, gave the customary signal, indicat-
ing that she wished to alight at said corner,
the nearest stopping place to her home on
Tonti street.

Instead of stopping the car in such manner
as to bring the rear step on a line with the
sidewalk on the further side of Tonti street,
according to the well-established custom of
defendant in the operation of its cars, the
motorman proceeded some 20 feet further, so
that the rear step of the car, off which plain-
tiff had to alight, instead of being at the
usual place where pedestrians cross the
street, was some 20 feet further, over the
neutral ground, where the car tracks are laid
on Tulane avenue. The plaintiff, a lady 44
years of age, and weighing 175 pounds, with
a small bundle in her hands, descended to
the ground in the usual manner, when she
missed her footing, fell, and suffered bodily
injury. These are the facts, substantially, as
alleged, in plaintiff's petition, as borne out
by the testimony in the record and not con-
troverted in this court.

The record further shows that at the street
crossing, where the car should have been
stopped, the car step would have been 14½
inches from the ground, which is level at that
point; that the neutral ground, on which the
tracks are laid rises gradually as it extends
towards the center of the block, and that
where the car actually was stopped, the car
step was 11½ inches above the neutral
ground; that there is a ledge of neutral
ground extending approximately 7 inches be-
yond a line perpendicular to the outer edge of
the step of the car; that this ledge of ground
is supported by a rock or concrete curb 4½
inches higher than the pavement, so that the
paved part of the street used for traffic was
16 inches lower than the car step, at the
place where plaintiff alighted. To say exact-

ly how plaintiff came to her fall is more a matter of surmise than of direct proof, but the only reasonable deduction to be drawn from all the testimony in the case is that she rested the foot upon which she alighted to the ground on the edge of the curbing; the berm or ledge of the neutral ground being too narrow to place her foot inside of the curb and too wide to permit her to reach the pavement beyond the curb; that in turning she slipped and twisted her ankle, causing her to lose her balance, thereby bringing her body in violent contact with the pavement below.

This conformation of the surface of the street made it dangerous for a lady of the age and weight of plaintiff to alight at this particular place.

Defendant does not plead contributory negligence, a defense which should be specially pleaded (Buechner v. City of New Orleans, 112 La. 599, 36 South. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455, affirmed in Robertson v. Jennings, 128 La. 804, 55 South. 375), but it alleges that the car was stopped at the usual place, at the street crossing, and that plaintiff was hurt by her own awkwardness. This defense is not supported by the evidence, was not urged in argument, and was virtually abandoned on appeal.

[1] The law as recognized in decisions of this court is that a carrier of passengers should exercise the strictest diligence in receiving a passenger, conveying him to his destination and setting him down as safely as the means of the conveyance employed and the circumstances of the case will permit. Le Blanc v. Sweet, 107 La. 355, 55 South. 672; Guidry v. M. L. & T. R. & S. S. Co., 140 La. 1008, 74 South. 534, L. R. A. 1917D, 962. Our conclusion then is that plaintiff was deposited at an unusual and more or less dangerous place, and that defendant failed to carry out its duty of safely setting plaintiff down from its car.

The quantum of damages is not contested in this court.

The judgment appealed from is affirmed.

## On Rehearing.

PROVOSTY, J. Plaintiff, a lady 44 years old, and weighing 175 pounds, fell while alighting from one of the electric street cars of the defendant company on Tulane avenue, and sues in damages.

The avenue consists of two asphalted roadways, with an unpaved neutral ground between them upon which the cars run. The surface of the roadway of the cross streets which traverse it, or in other words, the surface of its own roadway at the cross street intersections, is level with the neutral ground and with the top of the rails. It lowers gradually, though only slightly, in the direction of the middle of the block, while the neutral ground maintains its level. Plaintiff says that this difference in elevation between the asphalted roadway and the neutral ground does not exist at the regular stopping place for the cars, which is where the sidewalk of the cross street would pass if prolonged across the avenue; that at that place the neutral ground is level with the roadway; and she charges as negligence on the part of the defendant company that, for letting her get off, the car did not stop at this regular stopping place, but some 15 or 20 feet beyond. The neutral ground is of uniform width, and the outer edge of its curb is only 7 inches from the outer edge of the step of the car. Plaintiff attributes her fall to her having inadvertently, in descending from the car, laid her foot upon the outer edge of the curb of the neutral ground, and thus obtained an insecure foothold.

This alleged difference between the footing at the regular stopping place and at the place where the car stopped is the fundamental fact in plaintiff's case, and therefore the burden rested upon her to establish it to a

legal certainty. Whether she has done so is left doubtful by the evidence. But as perhaps she had no reason to suppose it would be seriously contested, we prefer to rest our decision upon the broader ground, that the place where the car stopped was reasonably safe for the alighting of a passenger, and that consequently the stopping there was not negligence.

[2] Were plaintiff to succeed, the doctrine of the case would have to be that, for a street car company to stop its car either short of, or beyond, the regular stopping place is negligence, unless the footing at the place where the car is stopped happens to be precisely similar to that at the regular stopping place. The practical operation of such a rule would be to necessitate the marking of the space constituting the regular stopping place, and to preclude the stopping elsewhere, unless the car company choose voluntarily to incur the risk of a lawsuit. A tardy signal for stopping would have to pass unheeded, with the consequence that many a passenger would be carried beyond his station. On days of rain and slippery tracks the car would have to approach a stopping place gingerly, with bated breath, as it were, lest it be not precise in making the stop. Perhaps such a rule would suit the car company, but certainly not the traveling public.

As a matter of fact, in New Orleans many cross streets do not traverse the car tracks at right angles. In all such cases the question of where was the proper place to stop would arise. Even in the present case the conductor and the motorman and another witness testify that the car made what they considered to be a perfect stop; that is to say, stopped at the proper place.

[3] At the place where the car stopped, the step of the car was 15½ or 16 inches above the roadway, accordingly as the stop was made 15 or 20 feet from the regular stopping place; and hence all plaintiff would have had to do for safely alighting would have been to extend her foot seven inches out and step down 15½ or 16 inches while holding on to a handlebar. We think such a place was reasonably safe, and that if plaintiff had been mindful of her step she would not have fallen. The conductor stood on the platform, and a gentleman friend of hers stood on the roadway at the car step, to afford her assistance if needed. We suspect the true cause of plaintiff's misadventure was that she was more mindful of the conversation, or attention, of this friend than of where she trod. At the regular stopping place plaintiff would have had to descend from practically the same height, 14½ inches.

Plaintiff's learned counsel cite a case where the car had stopped opposite "a deep gully," and another case where "the rails were on an artificial embankment 2 or more feet above the natural surface, and extending 12 or 15 inches from the rail," but evidently between situations like that and the situation in the present case, where the neutral ground was but 4 or 5 inches higher than the level asphalted surface of the street, there is no analogy.

Judgment set aside, and suit dismissed, at plaintiff's cost.

LECHE, J., dissents.